# City of Wilkes-Barre *v.* Joseph Garabed, Appellant.

*Police power defined—Fourteenth amendment.*

The police power of the state has been judicially defined to be the right to prescribe regulations for the good order, peace, health, protection, comfort, convenience and morals of the community which does not encroach on a like power vested in congress or state legislatures by the federal constitution or does not violate the provisions of the organic law, and it has been expressly held that the fourteenth amendment to the federal constitution was not designed to interfere with the exercise of that power by the states.

*Delegation of police power to municipalities.*

The legislature cannot delegate its power to make a law but it can make a law to delegate a power to determine some fact or state of things upon which the law makes or intends to make its own action depend. The state by the organization of cities imparts to its creature, the municipality, the powers necessary to the performance of its functions, and to the protection of its citizens in their persons and property.

*Delegation of police power to mayor—Reasonable discretion—Review by the courts.*

City councils under the police power may delegate to an officer like the mayor, authority to carry out the will of the corporation in the dispatch and control of daily affairs and the preservation of the public peace. The only limitation of this power is that it must be exercised in a reasonable, lawful and constitutional manner; if these limitations are not transgressed courts cannot interfere with municipal ordinances, for to the mayor and councils must be left a reasonable discretion.

*Street meetings—Use of drum—Public nuisance—Religious liberty.*

Public streets are designed for the use of the public in passing and repassing and the municipal authorities may inhibit the use of a drum, etc.,

intended to collect and retain a crowd at street meetings.    The fact that such uses of a drum, etc., for such purpose is adopted by a religious body as an adjunct of its proceedings does not affect the case.    The adoption of criminal methods or such as result in a public nuisance by a religious body cannot be tolerated under the plea of religious liberty.    The fact that a business or undertaking is lawful per se gives no justification for annoying the public in transacting it.  .

*Police power—Judicial discretion—Constitutional law—Use of drum— Street meetings—Salvation Army.*

A city may by ordinance prohibit the use of a drum or other musical instrument on the street without permit from the mayor and the mayor in his discretion under such ordinance may refuse a permit to the Salvation Army to conduct street meetings to the accompaniment of fife and drum. Such action is within the reasonable exercise of police power of both mayor and councils.    This is not such unreasonable exercise of police power as to permit of judicial review; it offends neither section 4, article 1 of the state constitution nor the fourteenth amendment of the federal constitution.

*Ordinance—Failure to enforce, not a precedent.*

The failure to enforce an ordinance in one case is no legal reason for objection to its enforcement in another. '

Argued Jan. 11, 1899.    Appeal, No. 32, Jan. T., 1899, by defendant, from judgment of C. P. Luzerne Co., Dec. T., 1898, No. 389½, in favor of plaintiff on case stated.    Before RICE, P. J., BEAVER, ORLADY, SMITH, W. W. PORTER, W. D. PORTER and BEEBER, JJ.    Affirmed.    Opinion by ORLADY, J.    BEEBER and W. W. PORTER, JJ., dissent.

Case stated.    Before WOODWARD, P. J.

The facts sufficiently appear in the opinion of the court below :  .

On November 1, 1898, the defendant was arrested for the violation of section 8 of the city ordinances, and, upon hearing before the mayor, was found guilty, and sentenced to pay a fine of $6.00 and the costs.    From this judgment the defendant took this appeal.

Section 8 of the city ordiances, entitled " Nuisances," is as follows: " It shall not be lawful for any person or persons to appear in any of the public streets or places in said city to play upon any hand-organ, hurdy-gurdy, tambourine, or other musical instruments, or beat upon a drum, or blow a horn or trumpet, without a permit from the Mayor, and any such permit may be

revoked by the Mayor whenever he may deem it expedient. And whoever appears in any of the streets, alleys or public places, to play, beat or blow upon either of such instruments without such permit, shall be liable to a fine of not less than two dollars nor more than twenty dollars. The High Constable or any policeman shall have the right to demand for examination the permit of any person so playing, beating or blowing. And no hand-organ shall be played more than one hour in any one day in any part of a public street between the same two cross streets, nor more than twenty minutes in front of the same premises, under a penalty of two dollars for each offence."

It appears from the case stated that the defendant is an ensign in what is known as the Salvation Army. Ensign Mugford and Lieutenant Hillman, of the same organization, who had preceded him at this post, had on a former occasion applied for a permit to beat their drum at their open-air meetings. This permit the mayor refused to grant. They proceeded, however, to hold meetings and beat their drum without a permit. They were arrested, brought before the mayor, and fined. The case stated proceeds to say : " They were then advised that they must obey the said ordinance as long as it remained in force. They thereupon reported to headquarters that they were thus prohibited from holding their regular services in the said city of Wilkes-Barre, and thereupon the defendant, being an ensign in the said Salvation Army, was ordered to said city to take charge of said services, and, in case of arrest, to proceed to test the legality and constitutionality of said ordinance. Proceeding accordingly, he was arrested and brought before the mayor, where he did not deny having held religious service in the street, and beating drums thereat, thus violating the said ordinance, but claimed that the ordinance was illegal and unconstitutional, being contrary to the spirit of our American institutions and government, and contrary to the provisions of the fourteenth amendment of the constitution of the United States, and of section three of article one of the constitution of Pennsylvania."

The ordinance of the city of Wilkes-Barre now in question was passed in pursuance of the police power vested in the boroughs and cities of the commonwealth. Upon such municipal bodies the state confers a portion of its sovereign power, for the purpose of enabling them to control their local affairs. The

police power of the state, as was said in Powell v. Com., 114
Pa. 265, " is the power vested in the legislature by the consti-
tution to make, ordain and establish all manner of wholesome
and reasonable laws, statutes, and ordinances, either with pen-
alties or without, not repugnant to the constitution, as they
shall judge to be for the good and welfare of the commonwealth
and the people of the same."

The fourteenth amendment to the constitution of the United
States declares that no state " shall deprive any person of life,
liberty or property without due process of law, nor deny to any
person within its jurisdiction the equal protection of the laws."

That this provision of the federal constitution has no possi-
ble application to the question now under consideration, is clear
both from reason and authority, for the city ordinance com-
plained of provides for an arrest and a hearing, a judgment and
an appeal.    Nor does it deny the equal protection of the law to
any class, sect or organization.    It was stated by counsel dur-
ing the argument that many military, political and theatrical
processions, accompanied by bands of music, had from time to
time been allowed to make demonstrations and parades in the
streets of the city without obtaining a permit so to do.    The
answer to this is twofold.    In the first place, the failure to
enforce an ordinance in one case is no legal reason for objection
to its enforcement in another.    And, secondly, it appears from
the case stated that, as a matter of fact, in the cases referred
to, no complaint had ever been lodged with the mayor, while,
in the case of the Salvation Army, many persons had complained
of the frequent beating of the drums, during their meetings,
upon the public square and streets of the city.

And the decisions of the courts are to the same effect.    Thus
in Barbier v. Connolly, 113 U. S. 27, where it was claimed that
the board of supervisors of San Francisco had transgressed the
fourteenth amendment by adopting an ordinance to prevent the
carrying on of the public laundry business within certain desig-
nated limits, without having first secured a municipal permit,
etc., the Supreme Court of the United States said : " But
neither the amendment—broad and comprehensive as it is—
nor any other amendment was designed to interfere with the
power of the State, sometimes termed its police power, to pre-
scribe regulations to promote the health, peace, morals, educa-

tion and good order of the people. . . . Special burdens are often necessary for general benefits. . . . Regulations for these purposes may press with more or less weight upon one than upon another, but they are designed not to impose unequal or unnecessary restrictions upon any one, but to promote, with as little individual inconvenience as possible, the general good. . . . . Class legislation, discriminating against some and favoring others, is prohibited; but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects all persons similarly situated, is not within the amendment."

In Reynolds v. United States, 98 U. S. 145, 166, the question was, whether a law restraining polygamus marriage was unconstitutional. Chief Justice WAITE, in delivering the opinion of the court, said: " Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices. Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice ? "

As counsel for the defendant argued that the city ordinance amounted to an infringement of the religious rights of the body known as the Salvation Army, we call attention to a case decided by the Supreme Court of the United States in the year 1845, Permoli v. New Orleans, 3 How. 589, where it was held that the court had no jurisdiction of the question whether a city ordinance does or does not impair religious liberty for the reason that the federal constitution makes no provision for protecting the citizens of the respective states in their religious liberties. This is left to the state constitutions and laws.

The case of Yick Wo v. Hopkins, Sheriff, 118 U. S. 356, to which we have been referred by the learned counsel for the defendant, does not seem to us to apply to the question now under consideration. The doctrine of that case was, that a municipal ordinance which made arbitrary and unjust discriminations founded on differences of race, was inconsistent with the guarantees contained in the fourteenth amendment to the constitution of the United States, in reference to differences

of race, or color, or nationality. The city ordinance contains no such discriminations, and is applicable alike to people of all races, colors and nationalities.

It remains to inquire whether the city ordinance offends the constitution of the state of Pennsylvania. Article I., section 3 provides that " All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; . . . . no human authority can, in any case whatever, control or interfere with the rights of conscience; and no preference shall ever be given by law to any religious establishments or modes of worship."

Assuming, for the sake of the argument, that an ordinance like that in question is contrary to natural justice, and, in its application, harsh and unnecessary, it will not, on such grounds alone, be held to be unconstitutional. The remedy for such laws is not, as a general rule, within the power of the courts, but rests exclusively in the legislative department of the government. As was said in Ervine's Appeal, 16 Pa. 256, 268, " The remedy for an unwise or impolitic or unfair act of the legislature is in that appeal to the people, which is so freely exercised when obnoxious but confessedly constitutional laws are enacted." And in Norris v. Clymer, 2 Pa. 277, 285, the Supreme Court held that the constitution allows the legislature every power which it does not positively prohibit. See also Com. v. Hartman, 17 Pa. 118. In Sharpless v. Mayor, 21 Pa. 147, now generally recognized as a leading case on questions involving the constitutionality of acts of assembly, it was said by Black, C. J.: " We are urged to hold that a law, though not prohibited is void if it violates the spirit of our institutions, or impairs any of those rights which it is the object of free government to protect, and to declare it unconstitutional if it be wrong and unjust. But we cannot do this." " A law that is unconstitutional is so because it is either an assumption of power not legislative in its nature, or because it is inconsistent with some provision of the federal or state constitution:" Com. v. Maxwell, 27 Pa. 444, 456. " Nothing but a clear violation of the constitution—a clear usurpation of power prohibited—will justify the judicial department in pronouncing an act of the legislative department unconstitutional and void:" R. R. Co. v. Riblet, 66 Pa. 164.

355, (1899).]      Opinion of Court below—Arguments.

In the light of these decisions and of many others which might be quoted, we could not be justified in holding the city ordinance in question unconstitutional and therefore void, unless convinced that in its application it has in some way transgressed the right of the members of the Salvation Army to worship God according to the dictates of their own consciences. It does not seem clear to us that the mere beating of a drum is any necessary part of divine worship. Nor are we aware that any other sect or denomination of Christians has ever introduced a bass drum into the instrumentation of their music. The city ordinance is not directed against their doctrine or dogmas, their faith or their forms. The streets and squares of the city are thrown open to their congregations, and police protection is afforded to all their assemblies. Under such circumstances it would seem that their duty is to obey the law, and to omit from their services the beating of their drums which has led to complaint on the part of some of their fellow citizens.

As the questions raised in this case partake of a religious nature, and have been treated as such in the argument of the learned counsel for the defendant, we conclude our opinion with a few quotations from the Holy Scriptures which seem to be pertinent. In the Epistle of Paul to Titus, chap. 3, we find this command : " Put them in mind to be subject to principalities and powers, to obey magistrates, to be ready to every good work."

In the First Epistle General of Peter, chap. 2, verses 13 and 14 : " Submit yourselves to every ordinance of man for the Lord's sake, whether it be to the king as supreme, or unto governors, as unto them that are sent by him for the punishment of evil doers, and for the praise of them that do well."

And in Romans, chap. 13, verse 1 : " Let every soul be subject unto the higher powers : for there is no power but of God : the powers that be are ordained of God."

Judgment will be entered for the plaintiff upon the case stated for the fine, $6.00, and costs.

Defendant appealed.

*Error assigned* was entry of judgment on case stated in favor of plaintiff.

*A. Ricketts*, for appellant.—It is respectfully submitted that

the decision of the United States Supreme Court in the case of Yick Wo v. Hopkins, 118 U. S. 356, expressly rules this case in favor of the defendant, the appellant.

And the court expressly distinguishes the case of Barbier v. Connolly, 113 U. S. 27 : Baltimore v. Radecke, 49 Md. 217.

A simple inspection of the ordinance of the city of Wilkes-Barre, in question in this case, will develop that it is precisely such an ordinance as is condemned in the said decisions.

The ordinance is of the same character as the California statute clothing the commissioners of immigration with similar unlimited and unregulated powers which received severe criticism from the United States Supreme Court in the case of Chy Lung v. Freeman, 92 U. S. 275, and it is justly obnoxious to similar caustic condemnation.

Then the court below relies upon the case of Barbier v. Connolly, 113 U. S. 27, which was expressly distinguished by the United States Supreme Court in the said case of Yick Wo v. Hopkins, because it was a decision with reference to an ordinance in which all persons were equally prohibited, and contained no provision for a permit to any one.

So far as we are informed, this question has not heretofore come before the courts in this state ; but it has in other states, and the very question now before us has been decided, and elaborate opinions delivered in the following cases, to wit : State v. Dering, 84 Wis. 585 ; In re Frazee, 63 Mich. 396 ; Chicago v. Trotter, 136 Ill. 430 ; Andersin v. Wellington, 40 Kan. 173.

As will be seen in these decisions, ordinances, identical with, or similar to, the one here in question, have uniformly been declared unconstitutional. These cases were all cited in the court below, but as appears from the opinion filed, were all simply ignored by the learned judge of that court.

No claim was at any time or in any way made by the appellant, that his right to religious liberty was protected by the federal constitution. That which he claimed, was that his rights in this respect, secured by section 3 of article 1 of the state constitution, were infringed by this ordinance, and its administration, and we here submit the same claim.

The learned judge of the court below does not seem to regard the drum as an instrument of salvation. If he should become familiar with some of the experiences of the Salvation

Army, he might change his mind.   For instance, they could tell him of a man who through dissipation had come to desperation, and concluding to end his disgust and distress, placed a pistol to his head and attempted to fire a bullet into his brain, but the cartridge failed to explode; as he was preparing to repeat the experiment, the Salvation Army drum attracted his attention, and going to see what it meant, he was awakened to a proper realization of his folly, and became a converted man and a useful citizen.   It would doubtless be interesting as well as useful to the learned judge, and to any one who is not familiar with it, to investigate and learn how important a part the drum in some form, has played in sacred service.   The Hebrew root taphaph signifies to beat a drum or timbrel; it seems to correspond to the Greek tuptein and to Sanscrit tup and our English tap.   The substantive toph signifies that which is beaten, drum, timbrel, tabret.   It is translated in our English version timbrel and tabret, but it seems to signify anything that is beaten, from what we would call a tambourine to a kettledrum.   That it was very early used in the social life appears from the conversation between Laban and Jacob recorded in the thirty-first chapter of Genesis, where it was spoken of as an instrument of known use.   That it was very early used in sacred service, appears in the tenth chapter of first Samuel, where it is mentioned as one of the instruments of the company of prophets that went to meet Saul.   It was generally played by women; when Moses and the children of Israel sang their song of thanksgiving for their wondrous deliverance at the Red Sea, recorded in the fifteenth chapter of Exodus, Miriam, the sister of Moses, led the women responding with timbrels and dances; when David returned with Saul after the slaying of Goliath, they were likewise met by bands of women with timbrels.   When David brought the ark from Kirjath-jearim, this was one of the instruments played in the grand procession then formed by David.   And so in other instances, the drum is mentioned as playing a regular part in the social and religious life of Israel.   The formation of the sacred processions is set forth in the sixty-eighth Psalm, in the twenty-fifth verse, to wit: the singers precede, form the van, the players on stringed instruments form the rear, and in the midst are maidens " tophephoth," literally " drumming; " this being the participle plural feminine of the verb taphaph above mentioned.

*C. F. McHugh*, for appellee.—The city of Wilkes-Barre made no effort to prevent these people from worshiping God according to the dictates of their conscience, and in preventing them, through the instrumentality of this ordinance, from the use of drums at their permanent place of meeting on the public square, they were doing only what the "police powers" of the city allowed them to do, and violated no law or constitution in so doing. In Reynolds v. United States, 98 U. S. 145, 166, Chief Justice WAITE drew the proper distinction when he said: "Laws are made for the government of actions and while they cannot interfere with mere religious belief and opinion, they may with practices. Suppose one believes that human sacrifice was a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice?"

This case is analogous to the case of Harrison v. Saint Mark's Church, where an injunction was granted restraining the ringing of the bells on Sunday, although it was argued that the ringing of the bell had become an integral part of the celebration of Sunday: Harrison v. Saint Mark's Church, 12 Phila. 259; s. c. 34 L. I. 222.

If the ordinance in question is a violation of the constitution it is so because it is either an assumption of power not belonging to the council or because it is inconsistent with some provision of the state constitution: Com. v. Maxwell, 27 Pa. 444, 456.

Nothing but a clear violation of the constitution—a clear usurpation of power prohibited—will justify the judicial department in pronouncing an act of the legislative department unconstitutional and void: Railroad Co. v. Riblet, 66 Pa. 164.

We are of the opinion that the case cited by the learned counsel for the appellant, to bring the ordinance in question within article 14, section 1 of the constitution of the United States, does not seem to us to apply to the question now under consideration: Yick Wo v. Hopkins, 118 U. S. 356.

The going into the public streets with horns and drums and instruments of that character has a tendency to attract crowds, obstruct the streets, frighten horses and impede travel, and a regulation of the character prescribed in the ordinance before the court is a proper exercise of the police powers vested in the city. It gives to the mayor, who has the direction of the

police force in Pennsylvania cities, notice that he may protect the public from the inconveniences resulting from the collecting of crowds on the public highways. We are unable to see how this case differs from Com. v. Davis, 140 Mass. 485.

The defendant's contention that this ordinance has become obsolete, because the same or a similar ordinance enacted in 1862 has not been enforced, and has been repeatedly violated cannot be sustained. A statute or ordinance remains in force until it is repealed: Com. v. Davis, 140 Mass. 485; Horr & Bemis's Police Ordinances, 97.

We respectfully submit that this case is not ruled by Yick Wo v. Hopkins, 118 U. S. 356, but by Barbier v. Connolly, 113 U. S. 27, cited in the opinion of the learned judges of the court below.

OPINION BY ORLADY, J., July 28, 1899:

The defendant, an officer in the Salvation Army, was arrested and sentenced to pay a fine and costs for violating an ordinance of the city of Wilkes-Barre. An appeal was taken to the court of common pleas, where a case was agreed to, and after hearing, a judgment was entered for the plaintiff, and the record has been brought to this court for review.

The ordinance, for the violation of which the defendant was arrested and fined, is as follows:

" It shall not be lawful for any person or persons to appear in any of the public streets or places in said city to play upon any hand organ, hurdy-gurdy, tambourine or other musical instruments, or beat upon a drum, or blow a horn or trumpet, without a permit from the Mayor, and any such permit may be revoked by the Mayor, whenever he may deem it expedient. And whoever appears in any of the streets, alleys, or public places to play, beat, or blow upon either of such instruments without such permit, shall be liable to a fine of not less than two dollars nor more than twenty dollars. The high constable or any policeman shall have the right to demand for examination the permit of any person so playing, beating or blowing. And no hand organ shall be played more than one hour in any one day in any part of a public street between the same two cross streets, nor more than twenty minutes in front of the same premises, under a penalty of two dollars for each offense." Adopted March 22, 1878.

In the defendant's appeal, he claims that this ordinance is unconstitutional and void for two reasons: first, because it is in violation of section 4 of article 1 of the state constitution which provides that "all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; . . . . no human authority can, in any case whatever, control or interfere with the rights of conscience; and no preference shall ever be given by law to any religious establishments or modes of worship;" and second, because it is in violation of that part of the fourteenth amendment of the constitution of the United States which provides that no state shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

As to the first claim—that the ordinance is void because it interferes with man's natural and indefeasible right to worship God according to the dictates of his own conscience—it cannot be sustained. Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions they may with practices. Suppose one believed that human sacrifices were a necessary part of religious worship, would it be seriously contended that the civil government under which he lived could not interfere to prevent a sacrifice? Reynolds v. United States, 98 U. S. (8 Otto), 145. Religious liberty does not include the right to introduce and carry out every scheme or purpose which persons see fit to claim as part of their religious system. While there is no legal authority to constrain belief, no one can lawfully stretch his own liberty of action so as to interfere with that of his neighbors, or violate peace and good order. The whole criminal law would be practically superseded if, under pretext of liberty of conscience, the commission of crime is made a religious dogma: In re Frazee, 63 Mich. 396. It is not necessary to cite any further authorities in support of so plain a proposition.

By an act of incorporation of May 4, 1871, P. L. 539, the then borough of Wilkes-Barre was made a city. The new charter became the source of power to enact and enforce the ordinance in question. By section 27 of the act, the power of the corporation "shall be vested in the corporate officers designated in the charter, to wit: the mayor and the city council; they

shall have power, First. To make such laws, ordinances, by-laws, rules and regulations not inconsistent with the laws of this commonwealth, as they shall deem necessary for the good government of said city. Second. To lay out . . . . streets . . . . as they may deem necessary. Fourth. To regulate the roads, streets, lanes . . . . pavements . . . . as they may deem advisable. Thirteenth. To prohibit and remove any obstructions in the highways, and any nuisance . . . . whether in the highways or in public or private grounds."

The legislature of the state represents the public at large, and has full and paramount authority over all public ways. The object of incorporating a town or city is to invest the inhabitants of the locality with the government of all matters that are of special municipal concern. By the organization thus affected the state imparts to its creature, the municipality, the powers necessary to the performance of its functions, and to the protection of its citizens in their·persons and property: Sayre Borough v. Phillips, 148 Pa. 482; 1 Dillon on Mun. Corps. sec. 308. The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would stop the wheels of government: Locke's Appeal, 72 Pa. 491.

The police power of the state is difficult of definition, but it has been held by the courts to be the right to prescribe regulations for the good order, peace, health, protection, comfort, convenience and morals of the community which do not encroach on a like power vested in congress or state legislatures by the federal constitution, or do not violate the provisions of the organic law, and, it has been expressly held that the fourteenth amendment to the federal constitution was not designed to interfere with the exercise of that power by the state: Powell v. Penna., 127 U. S. 678; Powell v. Com., 114 Pa. 205.

Under these grants of authority our cities and towns corporate are in the continual exercise of a most useful jurisdiction.

Under the authority derived through this charter, the mayor and the city council have the same authority to enact proper ordinances as the legislature would have in regard to the same subject-matter. The councils cannot be continuously in session, and the power represented by the charter is delegated to an

officer, named to carry out the will of the corporation. In this
ordinance, the power of determining whether any person shall
play, beat, or blow upon either of the instruments named, in
any of the streets, alleys or public places, is left practically
within the discretion of the mayor. The dispatch and control
of daily affairs, the disposition of emergency or unusual cases,
the preservation of the public peace, and the welfare of the
people require that the judgment and action of this officer be ap-
plied to events and persons under circumstances which are not
universal in their character. The mayor is a sworn official, and
it is to be presumed that, under his oath of office, his duties
as the representative of the city will be properly performed.
That he may abuse or misuse his discretionary powers is not of
itself a reason for believing that he will do so : Com. v. Muir,
1 Pa. Superior Ct. 578.

The discretion vested in the mayor is not arbitrary in the
proper use of the term. He is made the agent of the law, and
he is bound to exercise the discretion vested in him honestly,
fairly, reasonably and without prejudice or partiality, for the
just purpose of effectuating the intention of the statute : State
v. Yopp, 97 N. C. 477 ; s. c. 2 Am. St. Rep. 305.

That the power here conferred is sufficiently comprehensive
to cover every regulation necessary for the government of the
city and protection of its citizens cannot be doubted. The only
limitation of this power is that it must be exercised in a reason-
able, lawful and constitutional manner. If these limitations
are not transgressed, courts cannot interfere with the ordinances
of the municipality, for to the mayor and council must be left a
reasonable discretion, and for the proper and wholesome exercise
thereof they are accountable, not to the courts, but to the people
whom they represent : O'Maley v. Freeport, 96 Pa. 24. When
the municipal legislature has authority to act, it must be gov-
erned, not by our, but by its own, discretion ; and we will not
be hasty in convicting them of being unreasonable in the exer-
cise of it : Fisher v. Harrisburg, 2 Grant, 291. Nothing but a
clear violation of the constitution—a clear usurpation of power
prohibited—will justify the judicial department in pronouncing
an act of the legislative department unconstitutional and void :
R. R. Co. v. Riblet, 66 Pa. 164.

The general assembly is a co-ordinate branch of the state

government, and within the prescribed limits, so are the law-making municipal corporation. It is no more competent for the judiciary to interfere with the legislative acts of one than the other. When acting within their powers, or exercising a discretionary power, the courts are not warranted in interfering unless the power is abused to the oppression of the citizens, or for an equally good reason. The judgment of the mayor and the council as to what they " deem necessary for the good government of said city " is found in the ordinance.

From the case stated, it appears: " That the organization represented by the defendant understands the divine command to require it to go into the streets and there preach the gospel; that frequent complaints have been made to the mayor against the Salvation Army; the drum having been found by experience, to be one of the most effectual of instruments to call together those to whom they wish to preach and to hold and keep their attention during the service, the use of the drum has become a regulation part of their service ; that other officers of the organization had applied to the said mayor for a permit to beat the drum at their open air meetings in the streets ; this the mayor refused to grant. Nevertheless they proceeded to hold their services. They were thereupon arrested and fined; that the defendant held a religious service in the street and beating drums thereat."

The fact that the defendant represents a religious association has nothing to do with the case, nor is it pertinent to inquire into the purposes of the association, the propriety of its practices, or its judgment as to the use of drums as a regulation part of their service. It is only when political, religious, social, or other demonstrations create public disturbance, or operate as nuisances, or create or manifestly threaten some public or private mischief, that the law interferes, and not because of the sentiments or purposes of the movement, if not otherwise unlawful. The state has authority to make regulations as to the time, mode, and circumstances under which parties shall assert, enjoy, or exercise their rights without coming in conflict with any of those constitutional principles which are established for the protection of private rights and private property: Cooley's Const. Lim. 596 ; Com. v. Davis, 140 Mass. 485 ; State v. Freemen, 38 N. H. 426.

The public streets from side to side and from end to end belong to the public, which is entitled not only to a free passage along the highway, but to a free passage along any part of it not in the actual use of some other traveler.   They are designed and maintained for the use of the public in passing and repassing: Barker v. Com., 19 Pa. 412; Norristown v. Moyer, 67 Pa. 355.

The ordinance applies to all of the public streets or places in the city; it is not directed against the defendant or the organization he represents, or any other person or body of men.   Its manifest purpose is to regulate the use on the streets of the instruments named therein, so as to prevent what the defendant endeavors to effect in seeking the permit,—the calling together and holding a crowd,—and it is asserted to thwart that particular evil, and for no other purpose.   It is universally known that the effect of street meetings, which are frequently held in the same locality, in addition to obstructing the highway, is to induce loitering, to provoke strife and collisions, and to cause a common nuisance, and they are a serious grievance to the residents of the neighborhood.   The most desirable places for such meetings are the thronged thoroughfares in the populous parts of the city, where the injury to the people at large is the greatest, and the experience of municipalities is in exact accord with that of the defendant and his associates, viz : " The drum is an effective instrument to call together and hold a crowd."

Ample reason for the ordinance is shown, the fine imposed is a merely nominal one, and no anticipated danger to any person is threatened or even indicated.

It has been held by some courts to be an unreasonable and invalid power to authorize the mayor or the superintendent of police, in his discretion, to prohibit street parades and processions, but an examination of the cases relied on by the appellant will show that in each one there are preferences and discriminations, or unreasonable conditions, or penalties.   In State v. Dering, 84 Wis. 585; s. c. 19 L. R. A. 859, the ordinance did not apply to fire companies, the state militia, or to political parties having a state organization.   In Anderson v. Wellington, 40 Kan. 173; s. c. 2 L. R. A. 110, it did not apply to funerals, fire companies, regularly organized companies of state militia, or United States troops.   In Chicago v. Trotter, 136 Ill. 430, it

prohibited all parades or processions unless a permit therefor shall first be obtained from the police department. The court held that as parades and processions upon the city streets are not necessarily so productive of danger and disorder as to render them per se the creators of public disturbances, and that they are not necessarily nuisances, hence there is no authority in a city to suppress such demonstrations under all circumstances. In In re Frazee, 63 Mich. 396, it exempted funeral and military processions. Elaborate notes will be found in Richmond v. Dudley, 129 Ind. 112, s. c. 13 L. R. A. 587, St. Louis v. Russel, 116 Mo. 248; 20 L. R. A. (Mo.) 721, and notes, and Barbier v. Connelly, 113 U. S. 27.

The case of Yick Wo v. Hopkins, 118 U. S. 356, on which the appellant confidently rests his case, is not a controlling authority. In that case it is said : " The fact of discrimination is admitted. No reason for it is shown, and the conclusion cannot be resisted, that no reason for it exists except hostility to the race and nationality to which the petitioners belong, and which in the eye of the law is not justified. The discrimination is therefore illegal and the public administration which enforces it is a denial of the equal protection of the laws and a violation of the fourteenth amendment of the constitution," and on account of this the court said : " Though the law be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution." While the opinion furnishes argument against the validity of the ordinances on the ground that they lodged an unrestrained and arbitrary power with a single individual, we think that the dominant reason for reversing the judgment was that the power had been exercised in a manifestly arbitrary and unreasonable manner, which reason is entirely lacking in the case before us. The San Francisco ordinances prescribed the kind of buildings in which laundries might be located, provided for the inspection of said buildings, and prohibited the kindling or maintaining of open fire in houses, the immediate effect of which was to deprive the petitioners of their property and property rights without due process of law.

There is a wide distinction between the arbitrary refusal to issue a permit to conduct a lawful and established business, which is harmless in itself and useful to the community, and the refusal to grant a permit to use instruments on the street for the sole purpose of calling together and of holding therein a crowd of people.

As was said in Barker v. Com., 19 Pa. 412: "If the purpose of the meeting be lawful, a suitable place can be obtained for it without obstructing the public in their undoubted right of passing along their own highways. The freedom of the press is as well deserving protection as the liberty of speech; but, no one in his wildest enthusiasm in favor of the former has claimed the right to establish printing presses in the streets; one of Hoe's printing presses would certainly be as effectual in collecting a crowd as the harangues described in the indictment. The nuisance in the one case would be quite respectable in its nature and objects compared with the demoralizing character of the other. Both are prohibited by law as infractions of the public right of passage."

It is not unreasonable, impartial or oppressive because the power is to be exercised by the mayor, as he may deem expedient, which is equivalent to saying in his discretion, and which implies that it must be done with a sound discretion and according to law. A hard and fast rule or a clearly defined one cannot be laid down for the granting of such permits. The discretion to be exercised is one of wide latitude, depending on season, route, purpose in view, time, and many other conditions; and it imports the exercise of judgment, wisdom and skill as opposed to folly, passion and prejudice. The power to act must be lodged somewhere, and the city has seen proper to place it in the hands of its chief executive.

The case stated shows that military, political, religious, social organizations, fire companies and private enterprises have been permitted, for the purpose of display and advertisement, to have parades and occupy the streets with bands composed of players on drums, etc. These were each and all moving bodies of persons along the streets. The offense of the defendant was "having held a religious service in the streets and beating drums thereat," which was a stationary and fixed gathering of persons—remaining together—on the thoroughfares.

· The failure to enforce an ordinance furnishes no reason for not enforcing it under proper conditions. The ordinance has been continuously in force since its enactment; it has been acquiesced in through twenty years without objection by the people, and only after "frequent complaints have been made to the mayor" and the ordinance defied and violated is it invoked against the defendant. No fee is required to be paid. It is not even suggested that the mayor has exercised his power in an injurious or malicious manner, or that there has been any unjust or unfair discrimination, partiality or prejudice. The opposite of this is frankly stated by the appellant, viz: "the integrity of the mayor has prevented its being made the instrument of unjust extortion generally, for we believe him superior to such practice."

Without aid from the ordinance the mayor as the chief officer of the city would have the undoubted right, as a conservator of the peace, to disperse a crowd on a street, assembled and remaining for the purpose of holding religious worship, or for any other, or to prohibit on his own view the assembling of such a meeting, as it would necessarily interfere with the free use of the streets. To deny this power would be to turn the streets over to the will and pleasure of a mob. The purpose of the meeting does not furnish the right to hold it. The evil to be avoided is the interference with the rights of the public. The ordinance is a discretionary preventative to avoid what would reasonably be expected to happen if the use of such instruments was not restrained.

If a person doing business upon a public street carries on his business in such a way as to obstruct the street either by placing actual physical obstructions thereon, or by habitually carrying on his business in his store in such a way as to collect crowds upon the walks or streets in front of it, so as to interfere with the public travel, he is chargeable for a nuisance: Wood on Nuisances, sec. 264. The fact that the defendants' business was lawful does not justify them in annoying the public in transacting it; it gives them no right to occupy the public highway so as to impede the free passage of it by the citizens generally: Rex v. Jones, 3 Camp. 230 ; People v. Cunningham, 1 Denio, 524 ; 43 Am. Dec. 709. A tradesman may expose his wares for sale on his own property, but he must do it in such a

374     WILKES–BARRE *v.* GARABED.

Opinion of the Court—Dissenting Opinion.     [11 Pa. Superior Ct.

way as not, by so doing, to cause obstruction in the public street: Rex v. Carlile, 6 Car. & P. 636. It is not lawful for an auctioneer to place goods intended for sale in the public streets : Com. v. Passmore, 1 S. & R. 217 ; nor for a constable to conduct a sale under an execution in the public street of a city, thereby obstructing the passage : Com. v. Milliman, 13 S. & R. 403 ; nor for any one to erect in the street a figure calculated to collect and excite a crowd : Com. v. Haines, 4 Clark, 17 ; nor to collect a crowd by loud and indecent language : Barker v. Com., 19 Pa. 412 ; nor to erect and maintain a liberty pole in the open highway : Norristown v. Moyer, 67 Pa. 355. Loungers who occupy the public highway are obstructions of the public right of way, and nuisances : Com. v. Challis, 8 Pa. Superior Ct. 130 ; Braddy v. Milledgeville, 74 Ga. 516 ; s. c. 58 Am. Rep. 443. There are cases in conflict with the views herein given but the cases of Com. v. Davis, 140 Mass. 485, Com. v. Plaisted, 148 Mass. 375; s. c. 2 L. R. A. 142, and Com. v. Abrahams, 156 Mass. 57, furnish convincing reasons for holding the ordinance to be valid.

The judgment is affirmed.


BEEBER, J., dissenting :

Does the ordinance conflict with the provision of the fourteenth amendment of the constitution of the United States which deprives the states of the power to " deny to any person within its jurisdiction the equal protection of the laws ? " Upon the authority of the case of Yick Wo v. Hopkins, 118 U. S. 356, I am constrained to say that in my opinion it does. I cannot agree with the learned judge below that the doctrine of this case is that a municipal ordinance which made arbitrary and unjust discriminations founded on differences of race is inconsistent with this fourteenth amendment. The case goes much further than this. The ordinances under consideration in that case provided that no one should establish a laundry in the city of San Francisco " without having first obtained the consent of the board of supervisors, except the same be located in a building constructed either of brick or stone." The Supreme Court of California, from whose judgment the appeal was taken, had considered that the ordinances vested in the board of supervisors the usual discretion of granting or withholding assent to

the use of wooden buildings as laundries, but the Supreme Court of the United States refused to adopt that view of them. They were held to confer, not a discretion to be exercised as to whether certain rules and conditions prescribed for and operating upon all alike had been complied with, but a simple and naked arbitrary power to be exercised upon the mere whim or caprice of the board guided and controlled by no limitations or restraints. The greater part of the opinion is devoted to showing how such an unrestricted and unguided power is contrary to the principles upon which our institutions are founded and the nature and theory of our government. It was said that it is our boast that we live under a government of law and not of men, and that the phrase granting ".the equal protection of the laws" was equivalent to a grant of the protection of equal laws. The existence of such an arbitrary power was said to be intolerable in such a country as ours where there was no room for the play of passion, or whim, or caprice. It is true the facts of this case showed that the ordinances were applied in a way that discriminated against persons of a particular race which led the court to say: " In the present case we are not obliged to reason from the probable to the actual and pass upon the validity of the ordinances complained of, as tried merely by the opportunities which their terms afford, of unequal and unjust discrimination in their administration. For the cases present the ordinances in actual operation, and the facts shown establish an administration directed so exclusively against a particular class of persons as to warrant and require the conclusion that whatever may have been the intent of the ordinances as adopted, they are applied by the public authorities charged with their administration, and thus representing the state itself, with a mind so unequal and oppressive as to amount to a practical denial by the state of that equal protection of .the laws which is secured to all." We cannot, however, take this to mean that the court would have sustained the ordinances had not this partial and unjust operation of them been shown, because if we did, we would ignore the greater part of the opinion which was devoted to showing the invalidity of the ordinances on the ground that they lodged an unrestrained and arbitrary power with a single individual and we would have the court deciding that the validity of an ordinance depends upon the impartiality of its execu-

tion.  The case of Barbier v. Connolly, 113 U. S. 27, upon which
the court below relied, was distinguished in the Yick Wo case
and the difference is plain.   In the Barbier case the 4th section
of the ordinance was the only one under consideration, and so
far as appears from the report of the case this section did not
contain the offensive feature of a permit being required from a
particular person or board.   It was simply a prohibition of the
carrying on of the laundry business within certain limits in the
city of San Francisco from 10 o'clock at night until 6 o'clock
of the morning of the following day.   Besides, an examination
of the other sections of the ordinances, as set forth in the opin-
ion, shows, taken altogether, they required the parties from
whom the permits were to be obtained to go upon the premises
upon which it was proposed to conduct the laundry and see that
certain requirements of the ordinances as to the condition of the
property and the precautions to be taken to prevent fires had
been complied with, and if found satisfactory in this respect,
the license was to be issued.   This was a case where the dis-
cretion of those who were to give the permit was limited and
controlled by the extent to which certain well defined and clearly
described conditions had been complied with.

It is an established doctrine of the courts that every corpora-
tion has the implied power to pass by-laws, but such by-laws
must be reasonable, consistent with the general principles of
the common law, especially with those relating to the liberty
of the subject, with the general law and policy of the state,
and must not be oppressive, but impartial, fair and general:
1 Dillon on Mun. Corp. (6th ed.) secs. 319–322.   It is true, if
the legislature clearly gives a municipal corporation the power
to pass by-laws of a specified and defined character, and those
passed in pursuance of such a power are not in conflict with
the constitution, the courts are not at liberty to declare them
invalid because unreasonable, as they might do if the same by-
laws were passed under the implied power of the corporation
or under a general grant of power: 1 Dillon on Mun. Corp.
(6th ed.) sec. 328.   The powers given by the charter of the city
of Wilkes-Barre are not of that class.   They are found in the
first clause of section 27 of the Act of May 4, 1871, P. L. 539,
where the city council are given the power to pass such "by-laws
. . . . not inconsistent with the laws of the commonwealth, as

they shall deem necessary for the good government of said city,"
and in the thirteenth clause of the same section where they
are given the power " to prohibit and remove . . . . any nui-
sance . . . . whether in the highways or in public grounds."
The powers contained in these grants cannot be held to save
ordinances passed in pursuance of them from the scrutiny of
the courts upon the ground that they are passed in pursuance
of a power to pass ordinances of a specified and defined charac-
ter.   They are too general and undefined to put ordinances
passed in pursuance of them in that class.   Any ordinances
resting for their authority upon such powers as are granted to
the city of Wilkes-Barre, enumerated above, are still subject to
a decision by the courts as to their reasonableness, lawfulness
and constitutionality: O'Maley v. Freeport, 96 Pa. 24.

It is equally well established that the question whether an
ordinance is reasonable and consistent with the law is for the
court and not for the jury.   Of course courts are bound, in de-
termining this question, to consider all the circumstances of the
particular municipal corporation whose ordinances are under
review, the objects sought to be obtained and the necessity
which exists for the ordinances : Dillon on Mun. Corp. (6th ed.)
sec. 327.   The courts of our own state have frequently exer-
cised this power.   Two notable instances of it are found in
Commissioners v. Gas Co., 12 Pa. 318, and in Kneedler v. Nor-
ristown, 100 Pa. 368.

It appears clear to me that the ordinance in question in this
case offends not only against the fourteenth amendment to the
constitution of the United States, but also against the rule that
ordinances must be fair, impartial, general, not oppressive, and
consistent with the laws or policy of the state.   It is evident
that it does not intend to prohibit all playing on musical instru-
ments or beating upon drums in the public streets, for it pro-
vides for a permit to do it, which clearly shows that the city
council did not intend to declare against it, under any and all
circumstances, as a nuisance.   Nor does it prescribe regulations
for the use of musical instruments or drums upon the streets
with which all desiring to use them can comply.   It divides all
persons who desire to make music upon the streets into two
classes by an arbitrary line, upon one side of which are those
who are permitted to play upon instruments or beat upon drums

by the mere will and pleasure of the mayor, and upon the other side are those who are not permitted, or have been permitted and then refused, by the mere will and pleasure of the mayor. Both classes are alike in this, that they enjoy or are denied a. permissible line of conduct at the mere will of the mayor, and this without any regard whatever as to the character of the individuals or the circumstances under which they desire to do this allowable act. The ordinance is not like the license laws of the state which lodge a discretion with a public officer or with the court to grant or withhold license to sell liquors, because these laws prescribe certain qualifications on the part of the applicant and require certain and well defined conditions to be performed and a public necessity to exist, all of which must be taken into consideration when the judicial discretion is to be exercised. Even when the discretion is exercised under these conditions the laws are careful to provide an additional security against an abuse of discretion by giving an appeal.

The legislature of. this state shows consistent care to prevent an arbitrary and uncontrolled exercise of discretion when licenses or permits are to be issued. An examination of the different acts of assembly regulating the issuance of licenses or permits will show a marked difference in the manner of directing them to be issued between those acts in which such licenses or permits are required merely for purposes of revenue, and those in which they are required by laws founded upon the police power, passed for the purpose of regulating certain kinds of business with a view of conserving the good order or the good morals of society. Those required for purposes of revenue only are usually directed to be issued upon the mere payment of the fee. No room is left for a discretion to be exercised by the officer required to issue them. Those required because it is thought well, for the sake of the good order or good morals of the community, to regulate or restrain the business to be licensed or permitted, are usually directed to be issued only after it has been ascertained judicially that certain clearly defined conditions have been performed and prescribed limitations preserved, which conditions and limitations affect all alike similarly situated. The studiously maintained difference between these two classes of acts was clearly pointed out by Mr. Justice MITCHELL, when sitting as a common pleas judge in Philadelphia county, in

Com. v. Stokley, 12 Phila. 316, and in In re Stedman's Appeal, 14 Phila. 376. In considering what was the reason that the act under consideration, which was one regulating the issuance of licenses to theatres, provided for an appeal from the exercise of a discretion therein allowed, he said in the latter case: " Why, then it may be asked, was an appeal given to the court? It appears to me that the only reason was the invincible repugnance, under our institutions and habits of freedom, to the lodging of an absolute power, without supervision, in any one man, however competent as to himself or responsible as to his office." After showing how differently mayors, inspired by different purposes, might issue or refuse licenses he further said: " To guard against this possibility, and to secure the exercise of a fair and legal discretion, mindful alike of the public interests and of private rights, to do everything that is lawful in a lawful manner, the legislature, when by the Act of May 22, 1879, P. L. 73, it gave the mayor a discretion to issue or revoke a license, provided also that his discretion should not be arbitrary and unquestionable, but subject to appeal." These observations of his as to the care which the policy of our laws requires to be taken to hedge about, control and restrain the exercise of a discretion are abundantly sustained by the laws themselves.

The conclusion which I have reached in this case is in my opinion sustained by many authorities in addition to those already cited. City ordinances, different in no substantial respect from the one under consideration, have been declared void by the highest courts of several of the states: Anderson v. Wellington, 40 Kan. 173; 2 L. R. A. 110; Richmond v. Dudley, 129 Ind. 112; 13 L. R. A. 587; State v. Dering, 84 Wis. 585; 19 L. R. A. 859, where will be found a voluminous collection of the cases on this subject; Chicago v. Trotter, 136 Ill. 430; St. Louis v. Russell, 116 Mo. 248; 20 L. R. A. 721; Baltimore v. Radecke, 49 Md. 217; In re Frazee, 63 Mich. 396. It must be conceded that the Massachusetts and North Carolina cases are in conflict with our conclusion. My examination and consideration of these cases has satisfied me that the preponderance of the authorities of this country and the general policy of our own state laws sustain the conclusion at which I have arrived. Nor do I think that the case of Homer v. Com., 106 Pa. 221, conflicts

with this conclusion. In that case section 4 of the Act of Assembly of August 26, 1721, 1 Sm. L. 129, requiring a special license from the governor to sell fireworks in Philadelphia was before the court. A verdict was rendered against the defendant by agreement for the amount of the penalty subject to two points reserved: (1) Whether section 4 of the act of assembly of August 26, 1721, is still in force. (2) Whether said section has not become obsolete by reason of subsequent legislation. These were the only two points argued by counsel so far as their argument reported reveals, and it clearly appears from the opinion of the court that the only decision made was that the act had not become obsolete by nonuser, nor had it been repealed by subsequent legislation. In no event can it be considered a decision sustaining the validity of the statute after a consideration of an objection to it on the ground of the presence of the clause requiring a special license from the governor. In my opinion that objection to this act has not been adjudicated. The situation, as left by that decision, is not substantially different from that revealed by Philadelphia v. Ridge Ave. Railway Co., 102 Pa. 190, and Ridge Ave. Pass. Ry. Co. v. Philadelphia, 124 Pa. 219. In the first of these cases the city of Philadelphia recovered a verdict against the Ridge Avenue Passenger Railway Company which was sustained upon the assumed validity of the Act of March 8, 1872, P. L. 264. In the second case this act of March 8, 1872, was declared unconstitutional in a suit by the city of Philadelphia, which could not have been sustained except upon the theory of the unconstitutionality of the act of 1872. The same plaintiff in the first suit sustained a verdict in its favor upon the assumed constitutionality of an act, and in the second suit sustained a verdict in its favor because the same act, which had been assumed by all parties, including the court, to be constitutional, was unconstitutional. The Supreme Court was not held to have decided upon the constitutionality of the act in the first suit for the evident reason that the question had not been raised and passed upon in that suit.

I would reverse the judgment in this case and direct the prisoner to be discharged.

WILLIAM W. PORTER, J., joins in this dissent.